UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALEXANDER ALCIBIADES JACKSON,

                Plaintiff,           Civil Action No. 16-13534
                                          Honorable Marianne O. Battani
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

       Plaintiff Alexander Alcibiades Jackson ("Jackson") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

       For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Jackson is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Jackson's Motion for Summary Judgment [11] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On February 21, 2014, Jackson filed an application for DIB, alleging a disability onset date of May 1, 2011.  (Tr. 17, 69, 80, 160).  This application was denied at the initial level.  (Tr. 80).  Jackson filed a timely request for an administrative hearing, which was held on July 27, 2015, before ALJ Jan Leventer.  (Tr. 31-68).  Jackson, who was represented by attorney Andrea Hamm, testified at the hearing, as did vocational expert ("VE") Elizabeth Pasikowski.  (*Id.*).  On August 28, 2015, the ALJ issued a written decision finding that Jackson is not disabled under the Act.  (Tr. 14-30).  On August 4, 2016, the Appeals Council denied review.  (Tr. 1-5).  Jackson timely filed for judicial review of the final decision on October 3, 2016.  (Doc. #1).  On March 13, 2017, Jackson filed a Motion for Summary Judgment.  (Doc. #11).  The Commissioner filed a Motion for Summary Judgment on April 6, 2017.  (Doc. #12).  Despite the Commissioner pointing out multiple instances in which Jackson failed to identify evidence supporting his arguments (*e.g.*, Doc. #12 at 5, 6, 8, 10) and relied upon inapplicable law (*id.* at 10), Jackson did not file a reply brief.

B.    **Framework for Disability Determinations**

Under the Act, DIB benefits are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

2

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.    Background

### 1.    *Jackson's Reports and Testimony*

At the time of the administrative hearing, Jackson was 44 years old, and at 6'1'' tall, weighed 230 pounds.  (Tr. 39-40, 69, 171).  He lived in an apartment with his fiancée and two children.  (Tr. 162).  Jackson completed high school and worked at an irrigation business between April 1999 and May 2011 for ten to twelve hours a day, six days a week.  (Tr. 40, 150, 172, 196).  At this job, he installed and serviced underground lawn sprinkler systems for both commercial and residential clients.  (Tr. 151).  It required him to use machines, tools, or

3

equipment; use technical knowledge or skills; and write and complete reports.  (Tr. 151, 173).
He lifted fifty pounds frequently and up to over 100 pounds.  (*Id.*).  Prior to this, he was in the
Army between 1989 and 1992 and served in the Gulf War.  (Tr. 232, 267, 286, 355).

Jackson alleges disability as a result of various physical and mental conditions, including
chronic back pain, high blood pressure, and post-traumatic stress disorder ("PTSD").  (Tr. 171).
These conditions affect his ability to lift, squat, bend, stand, reach, walk, kneel, hear, climb
stairs, see, remember things, complete tasks, concentrate, and get along with others.  (Tr. 167).
His "lower back condition" prevents him from "doing anything physical."  (Tr. 162).  He
sometimes can't get out of bed and has spent days crawling around his house "on all fours"
because of his back.  (Tr. 62).  He uses a TENS unit on his back every other week; it gives him
relief for five to fifteen minutes, but after that, his back "will start hurting."  (*Id.*).  His PTSD and
"mood disorders" cause confusion and make him experience flashbacks (as opposed to seeing
them).  (Tr. 182).  They also preclude him from "any social interaction," including working with
others.  (Tr. 162).  He gets nightmares and night sweats, and if he sleeps "crooked," his back
starts to hurt and wakes him up throughout the night.  (Tr. 62, 163, 182).  He is supposed to use a
breathing machine for sleeping, but he doesn't use it (or only puts it on for up to twenty minutes)
because it gives him "gas mask flashback[s]" and makes him feel aggravated and claustrophobic.
(Tr. 40-41).  According to Jackson's Disability Report, his lower back pain worsened in June
2014, which "limit[s] [his] daily routine."  (Tr. 177).  That same month, his PTSD also
worsened.  (Tr. 177, 181).  He can pay attention for up to five minutes; has to read written
instructions multiple times to fully understand them; and does not understand spoken instructions
very well (he has to write important things down).  (Tr. 167).  He is not good at handling changes

in routine and when under stress, he has a "decrease in work efficiency and ability to perform occupational tasks." (Tr. 168).

Jackson indicated in his Function Report and in his Disability Report that he takes the following medications:  Cyclobenzaprine (for muscle spasms), Hydrocodone or Vicodin (for pain), Ibuprofen (for pain), Diclofenac (for pain and inflammation), Amlodipine (for high blood pressure), and Fluoxetine or Prozac (for PTSD).  (Tr. 40-41, 152, 169, 174, 180, 194, 200).  The side effects from taking Prozac include what he describes as "bad thoughts" and a "bad attitude towards everyone."  (Tr. 169).  At the hearing, he said he stopped taking Prozac because it made him suicidal and amplified his negative thoughts and reactions.  (Tr. 42-43, 59).

Jackson testified that Vicodin gives him mood swings, meaning it makes him feel aggravated and "real edgy."  (Tr. 41-42).  When he experiences these "lashes" or "aggravated assaults," he physically removes himself from his family and goes to the basement for up to forty-five minutes at a time, in part, so that his children don't see his aggravation and anxiety. (Tr. 42-43).  While in the basement, he walks back and forth and has to sit in a dark, cool space. (Tr. 59).  He suspects that he has an anxiety attack or a nervous breakdown because he shuts down mentally and becomes "numb" to everything around him.  (*Id.*).  Jackson testified that this happens at least once a day.  (Tr. 58).  He has more than one anxiety attack per day once or twice a week.  (Tr. 61).  His medications also cause difficulty with urinating.  (Tr. 44-45).  Jackson has not told a doctor about these side effects because of communication problems and "big trust issues" with doctors.  (Tr. 43, 45).  In addition to these medications, Jackson uses marijuana every other day to calm himself down and drinks half a pint of alcohol every weekend.  (Tr. 50-52).

During the hearing, Jackson testified that he would not be able to perform a job for eight hours a day, five days a week that accommodated his needs and gave him a fifteen-minute morning and afternoon break, and a half-hour lunch break, because there are instances where his medications "still don't perform" or "won't act right" and "do what they're supposed to do." (Tr. 52). As a result, he sometimes cannot get out of bed when he wakes up in the morning. (*Id.*). He testified that instead of two fifteen-minute breaks, he would need ten to fifteen half-hour breaks, which means he might as well stay home. (Tr. 53).

Jackson can walk approximately two blocks or one-quarter of a mile before having to rest, sit for five minutes,[1] and stand for up to ten minutes. (Tr. 54-56, 167). After walking two blocks, he gets pain in his back that radiates and causes numbness in his legs. (Tr. 55). Within five minutes of sitting down, he gets uncomfortable and has to adjust his position, get up and walk, or sit or lay on the floor. (Tr. 54). If he stands for more than ten minutes, he experiences pain in his lower spine, which is alleviated by laying down on the floor. (Tr. 56). His most comfortable position is on the floor; he spends a total of five or six waking hours on the floor in a twenty-four hour period. (Tr. 63). He can lift a gallon of milk. (Tr. 53).

Jackson testified that if he leaves his house, he has flashbacks. (Tr. 43). He therefore doesn't go outside unless he has to, which is usually to do laundry or go to the store. (Tr. 60, 165). He goes to the store by himself because he doesn't want his family to witness an "outbreak" or "outburst" from him seeing someone on the street that "trigger[s] many things in

---

[1] During the hearing, the ALJ noticed that Jackson was "squirming a lot" but had remained sitting down "for a long time." (Tr. 54). Given her observation, she offered Jackson the opportunity to provide a different time frame for sitting down "without being uncomfortable" that was greater than five minutes. (*Id.*). Jackson responded that "it would depend on the type of sitting situation." (Tr. 55). For example, he has to get up after five or ten minutes of sitting on his couch. (*Id.*).

his head."[2]   (Tr. 60).   His last "public outburst" was two weeks before the hearing at a laundromat, where he thought an individual of Muslim descent was carrying an automatic rifle or the receiver of an AK-47 but was actually carrying an umbrella.   (*Id.*).   Jackson's thoughts became "more aggressive" and he had to "leave quick."   (Tr. 61).   Jackson walks to places and can go out alone.   (Tr. 165).   He does not drive because of "road[]rage."   (*Id.*).

Jackson takes care of his personal needs even though he struggles with bending over. (Tr. 163).   He does not prepare his own meals.   (Tr. 164).   He needs reminders to take his medication and helps take care of his children "as best [he] can."   (Tr. 163-64, 181).   He helps around the house "to the best of [his] ability."   (Tr. 163).   He does laundry and washes dishes. (Tr. 164).   He is able to pay bills and handle a savings account but cannot count change or use a checkbook or money orders because his PTSD causes confusion and affects his ability to concentrate.   (Tr. 165).   His hobbies include playing music as a DJ, but he "rarely" does this now "due to loss of interest."   (Tr. 166).   He does not spend time with others.   (*Id.*).   In fact, he avoids "any social activities" because his stress and anxiety disorder "create problems" when he is around others.   (Tr. 167).   He explained that his difficulties with social interactions include "communication, distrust, and [an uncontrollable] temper."   (*Id.*).   When he was working, he was not allowed to interact with customers or clients, but he has never been fired or laid off because of problems getting along with people.   (Tr. 168).

---

[2] In his Function Report, Jackson indicated that he "can't go out to do any shopping or deal with [people]/crowds" because he has "panic attacks and violent mood swings/disorder."   (Tr. 165). As a result, he wrote that he shops for food, clothes, and household items online that get delivered to his front door.   (*Id.*).

### 3.    *Medical Evidence*

The Court has thoroughly reviewed Jackson's medical record.[3]  Rather than summarizing

his medical history here, the Court will make references and provide citations to the record as

necessary in its discussion of the parties' arguments.

### 4.    *Vocational Expert's Testimony*

Elizabeth Pasikowski testified as an independent VE at the administrative hearing.  (Tr.

63-67, 207).  The VE characterized Jackson's past relevant work doing irrigation installation as

medium according to the Dictionary of Occupational Titles ("DOT") and having a skill level of

5.  (Tr. 206).  The ALJ asked the VE to imagine a hypothetical individual of Jackson's age,

education, and work experience that could perform light work with the following physical

limitations:  occasionally reaching overhead left and right; occasionally climbing ramps and

stairs;  never climbing ladders, ropes, and scaffolds;  never crawling;  never working at

---

[3] At the hearing, the ALJ agreed to leave the record open to allow Jackson to submit additional
medical records from the Department of Veterans Affairs for consideration.  (Tr. 23, 38-39).
These records were entered into the evidence as "Exhibit 4F" and were referenced by the ALJ in
her decision. (Tr. 23).  Following the ALJ's decision, Jackson submitted additional evidence that
was incorporated into the record as "Exhibit 5F" and "Exhibit 6F."  The Appeals Council
considered this new evidence, but determined that "this information does not provide a basis for
changing the [ALJ's] decision."  (Tr. 2, 4).  "[W]here the Appeals Council considers new
evidence but declines to review a claimant's application for [DIB] on the merits, the district court
cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's
decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citing *Cotton v.
Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)).  Thus, in reviewing the ALJ's decision in this case,
the Court cannot consider Jackson's post-decision evidence labeled "Exhibit 5F" and "Exhibit
6F."

"The district court can, however, remand the case for further administrative proceedings in light
of the [new] evidence, if a claimant shows that the evidence is new and material, and that there
was good cause for not presenting it in the prior proceeding," as required by sentence six of 42
U.S.C. § 405(g).  *Id.* (citing *Cotton*, 2 F.3d at 696).  But, as the Commissioner points out,
Jackson made no such argument for remand under sentence six of 42 U.S.C. § 405(g) in his
motion for summary judgment.  (Doc. #12 at 4 n.2).  And, even after the Commissioner noted
this, Jackson elected not to file a reply brief.  A sentence six remand is therefore not appropriate.

unprotected heights; occasionally moving mechanical parts; and occasionally operating a motor vehicle. (Tr. 64-65). In addition, the following mental limitations would apply: simple, routine, tasks; simple, work-related decisions and simple, work-related decisions regarding changes in the work setting; and frequently responding appropriately to supervisors, coworkers, and the public. (Tr. 65). The VE testified that the hypothetical individual would not be capable of performing the past relevant work but could perform other work that exists in the national economy: inspector (92,000 jobs nationally); assembler (112,000 jobs); and packer (performed at the light level) (63,000 jobs). (*Id.*). The VE stated that her testimony is consistent with the DOT and the Selected Characteristics of Occupations. (Tr. 66).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous example, with one more limitation: in addition to normal breaks, the individual would be off-task twenty percent of the workday. (Tr. 65). The VE testified that this person could not perform the past relevant work and could not perform any other work that exists in the national economy. (Tr. 65-66). She explained that this testimony is based on her experience because the DOT does not address time off-task. (Tr. 66).

The VE also relied on her experience in testifying about missing work and taking breaks because those topics are likewise not covered by the DOT. (Tr. 67). Specifically, the VE testified that missing work two or more days per month on a regular or consistent basis would be work preclusive. (Tr. 66). And in the VE's opinion, having to take more than the allotted scheduled breaks, with each break lasting more than five minutes, would similarly be work preclusive. (Tr. 66-67).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Jackson did not

engage in substantial gainful activity since May 1, 2011 (his alleged onset date).  (Tr. 19).  Next, the ALJ found that Jackson has the severe impairments of chronic back pain from a spinal disorder, hypertension, PTSD, moderate obstructive sleep apnea, tinnitus, marijuana use disorder, and obesity.  (*Id.*).  At Step Three, the ALJ found that Jackson's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 20-22).

The ALJ then found that Jackson retains the residual functional capacity ("RFC") to perform light work, with the following additional limitations:  he is restricted to occasional overhead reaching; he cannot climb ladders, ropes, or scaffolds; he cannot crawl; he can occasionally climb ramps and stairs; he can occasionally work around moving mechanical parts and occasionally operate motor vehicles; he cannot work at unprotected heights; he is restricted to simple, routine, and repetitive tasks and simple, work-related decisions; he can frequently respond appropriately to coworkers, supervisors, and the public; and he can deal with only simple changes in the work setting.  (Tr. 22-26).

At Step Four, the ALJ concluded that Jackson is unable to perform his past relevant work as a sprinkler installer/servicer.  (Tr. 26).  At Step Five, the ALJ found that considering Jackson's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy:  inspector, assembler, and packer.  (Tr. 26-27).  As a result, the ALJ concluded that Jackson is not disabled under the Act.  (Tr. 27).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by

11

a party.") (internal quotations omitted).    If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F.    Analysis**

In his motion for summary judgment, Jackson argues that:  (1) the ALJ erred by relying on the opinion of non-examining psychiatrist Daniel Blake, Ph.D., in evaluating the severity of Jackson's mental impairments because Dr. Blake's opinion is not based on a review of the entire record; (2) the ALJ's mental RFC is unsupported by a medical RFC assessment, and the ALJ failed to address Jackson's work-related mental functions in compliance with Social Security Ruling ("SSR") 96-8p and SSR 85-15; and (3) the ALJ's RFC is flawed because it fails to include a "function-by-function assessment" of Jackson's exertional capacity, as required by SSR 96-8p.  These arguments are addressed below.

*1.    The ALJ did not Err in Relying on the Opinion of Non-Examining Psychiatrist Dr. Blake*

Jackson argues that the ALJ erred by giving the opinion of State agency consultative examiner Dr. Blake "great weight" where (a) Dr. Blake did not review all of the medical evidence in the record; (b) Dr. Blake did not review "any medical documentation

contemporaneous to the time of his examination"; and (c) Dr. Blake's opinion "is not consistent with the medical documentation as a whole."[4]  (Doc. #11 at 16).

On May 12, 2014, Dr. Blake reviewed Jackson's medical records through May 7, 2014[5] and evaluated Jackson's medically determinable impairments and their severity.  (Tr. 71-73). Dr. Blake also conducted a mental RFC assessment and made a determination that Jackson is not disabled.  (Tr. 75-79).  At Step Three of the ALJ's decision, the ALJ considered Dr. Blake's findings as follows:

> Based on a review of [Jackson's] records, Dr. Blake opined that [Jackson's] mental disorders caused mild problems with activities of daily living and moderate problems maintaining concentration, persistence or pace.  [Jackson] had moderate problems interacting and relating with others.  [Jackson] had experienced no extended episodes of decompensation [].  I have given great weight to the opinions of Dr. Blake, who is familiar with agency analyses.  Dr. Blake's opinions are consistent with the record as a whole.

(Tr. 22).

Jackson first argues that Dr. Blake's May 12, 2014 opinion is faulty because he did not analyze "147 pages from September 2, 2014 through October 28, 2014," *i.e.*, Ex. 3F (Tr. 363-509), which purportedly contained "years of psychotherapy as well as psychiatric evaluations." (Doc. #11 at 16).  Jackson argues that because Dr. Blake did not review these records, the case should be remanded "for a proper psychiatric evaluation as required by 20 C.F.R. §§ 404.1503(4), 416.903(e)."  (*Id.* at 16-17).  This argument lacks merit in multiple respects.

---

[4] Jackson also argues that "[t]he opinion of a non-examining physician is entitled to little weight if contrary to the opinion of a treating physician."  (Doc. #11 at 16).  As discussed below, *infra* at 18-19, this is not an accurate statement of the law.

[5] Considering that the latest record reviewed by Dr. Blake was less than a week old, it is unclear why Jackson contends that Dr. Blake did not review "any medical documentation contemporaneous to the time of his examination."

First, Jackson mischaracterizes these records. Of the 147 pages, only a few relate to issues relevant to Dr. Blake's mental RFC determination. (Tr. 377, 392, 417, 420-22, 423-43, 463-65). And, those documents relate to Jackson's mental health appointments from April 2014, May 2014, and August 2014 – not "years of psychotherapy as well as psychiatric evaluations," as Jackson asserts. Moreover, some of the records within the 147 pages are copies of records that appear elsewhere in the transcript. (*See, e.g.*, 423-29 (copy of Tr. 250-55), 429-35 (copy of Tr. 256-60), 438-44 (copy of Tr. 265-70), 466-70 (copy of Tr. 250-55)).

Second, there is no case law or regulation requiring a consulting examiner to provide his opinion only after the record is otherwise closed, *i.e.*, after all other relevant medical evidence has been procured. "[A] non-examiner's review of a complete case record is an *example* of an appropriate circumstance in which to afford a non-examiner's opinion more weight than an examiner's opinion"; however, "there is no requirement that a non-examiner's opinion be based on a review of the entire record in order to support an ALJ's decision denying benefits." *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (E.D. Mich. Jan. 27, 2016) (citing SSR 96-9p, 1996 WL 374180, at *3 (July 2, 1996)); *Weaver v. Comm'r of Soc. Sec.*, No. 16-cv-10942, 2017 WL 1212995, at *10 (E.D. Mich. Jan. 20, 2017) (internal citations omitted); *Gloria Denise Beasley v. Comm'r of Soc. Sec.*, No. 14-cv-14386, 2016 WL 6828212, at *6 (E.D. Mich. Jan. 5, 2016) (determining that upon consideration of SSR 96-9p, 1996 WL 374180, at *3, the plaintiff's argument that a non-examining source's opinion cannot be used to support an ALJ's decision denying benefits where it is not based on a review of the entire record fails). Thus, the mere fact that Dr. Blake issued his opinion a few months before additional medical records were procured and/or created does not mean the ALJ cannot rely on his opinion to support her findings.

Finally, while Jackson contests the ALJ's conclusion that Dr. Blake's opinion is consistent with "the record as a whole," he does not point to a single record in the "147 pages" at issue (or elsewhere in the record) that he contends undermines Dr. Blake's opinion or the ALJ's analysis.[6]  (Doc. #11 at 16).  Indeed, while some of those records document Jackson receiving mental health treatment for his impairments, as the ALJ explained, they are consistent with Dr. Blake's findings.  (Tr. 22, 25).  For instance, during a mental health consultation on April 9, 2014, Jackson was found to be fully alert and oriented to date, time, place, and person.  (Tr. 442). He was cooperative and well-spoken with normal rate and rhythm.  (*Id.*).  While his mood was anxious, his thought process was goal-directed and organized, and he had normal thought content.  (*Id.*).  He had fair insight and judgment and an appropriate fund of knowledge.  (*Id.*). On April 23, 2014, Department of Veterans Affairs ("VA") staff psychiatrist V. A. Kololgi, M.D., conducted a psychiatric diagnostic evaluation, where he assessed Jackson as "stable."  (Tr. 433).  Dr. Kololgi noted that Jackson was able to make decisions.  (Tr. 431).  On April 30, 2014, Jackson saw VA staff psychologist, Eric Beshears, Ph.D., who described his mental status evaluation of Jackson as follows:

> [R]apport [with Jackson] was established with relative ease . . . . [He] was pleasant and cooperative throughout the evaluation . . . . [His] [s]peech was logical and relevant, without obvious abnormality in rate, volume, articulation, or prosody.  Eye contact was appropriate.  [Jackson's] thought processes were logical, goal oriented and future focused.  He was alert throughout the evaluation and was oriented to all spheres.  No significant difficulties were observed in attention or concentration during

---

[6] In discussing this issue, Jackson argues that because "[Dr. Blake's] opinion is not based on all the information in the case record [] this matter should be remanded for a proper psychiatric evaluation as required by 20 C.F.R. §§ 404.1503(4), 416.903(e)."  (Doc. #11 at 16-17). However, the cited regulations appear inapplicable to the issues at hand.  20 C.F.R. § 404.1503, which is entitled "Who makes disability and blindness determinations," contains no subsection (4) and no mention of the issues alluded to by Jackson.  *See* 20 C.F.R. § 404.1503.  Similarly, 20 C.F.R. § 416.903(e), is entitled "Determinations for childhood impairments," and thus is inapposite.  *See* 20 C.F.R. § 416.903(e).

> the interview. [Jackson's] immediate memory was 3/3 items, while delayed memory was 1/3 after five minutes. No psychomotor abnormalities evidenced. [Jackson] denied any A/V hallucinations . . . . No delusional beliefs were reported by [Jackson], and no overt evidence of a thought disorder [was] noted . . . . Abstract reasoning and fund of knowledge appeared within normal limits. Judgment and insight were fair. [Jackson] endorsed fleeting current suicidal daily, but no plan or intent.

(Tr. 468). Although Dr. Beshears noted some severe findings, overall his conclusion was that despite those impairments, Jackson "functions satisfactorily with effort." (Tr. 471). On May 14, 2014, Jackson was awaiting "the start of the next CPT group [therapy session]," and a VA social worker contacted him at his home to discuss that matter. (Tr. 420). Jackson returned her call the next day, and the social worker documented the following:

> [Jackson] returned writer's call. Writer introduced herself and offered support to [Jackson] as he awaits his EBP. His speech was normal rate and tone. He denied [suicide/homicidal ideations]. He reported that he was "fine" but was suffering from some "physical ailments" that he felt triggered his PTSD symptoms; [he] reported that he has an [appointment] with his [primary care physician] on [May 23] to discuss. Writer offered support to [Jackson]; he thanked [her] but declined at this time.

(Tr. 420). On May 15, 2014, a nurse practitioner noted that Jackson was alert and oriented times three. (Tr. 417). Furthermore, on August 29, 2014, VA staff physician Gary A. Weekes, M.D., recorded that Jackson was alert and oriented and responding to questions. (Tr. 377).

The ALJ cited additional evidence that supports Dr. Blake's findings. For example, she discussed that VA staff psychologist Bernard Gaulier, Ph.D., opined in 2012 that Jackson had a GAF score of 65, where a score between 61 and 70 "is reflective of some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning. Such an individual is generally functioning pretty well and has some meaningful interpersonal relationships." (Tr. 23). The ALJ considered that in December 2012, Jackson had recently started taking Prozac, and he denied suicidal ideations and reported continued anxiety

but fewer nightmares. (*Id.*). The ALJ took note of a January 2014 VA report that "indicates that [Jackson's] symptoms would decrease [his] efficiency and ability to perform occupational tasks only during periods of significant stress." (Tr. 24). The ALJ also noted that in March 2014, Dr. Gaulier opined that Jackson had a GAF score of 58, where a score from 51 to 60 "is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning." (*Id.*). She referenced a psychiatrist's opinion that Jackson had a GAF score of 64, which the ALJ pointed out "indicat[es] mild symptoms." (Tr. 24-25). She also noted that "[t]reating professionals have consistently indicated that [Jackson] has had mild (or briefly moderate) mental functional limitations," and that Jackson had received mostly "sporadic[]" mental health treatment, which included "oral medications and intermittent psychotherapies." (Tr. 26).

The law is clear that "[w]here . . . the ALJ 'thoroughly considered and discussed those records and opinions dated after [the state agency consultants] gave [their] opinion[s],' he does not err in relying on those opinions." *Weaver*, 2017 WL 1212995, at *10 (citing *Schaub v. Comm'r of Soc. Sec.*, No. 1:16-CV-80, 2016 WL 6122602, at *5 (W.D. Mich. Oct. 20, 2016) and *Cady v. Comm'r of Soc. Sec.*, No. 1:14-cv-57, 2015 WL 3767666, at *6 (W.D. Mich. June 17, 2015)) (concluding that "the ALJ's reliance on the state agency consultants should provide no grounds for remand" where "[t]he ALJ's opinion makes clear that he considered the consistency of the state agency consultants' opinions with the entire record, as well as the remainder of the medical record excluded from their review"). Here, the ALJ reviewed mental health records from May 2014, August 2014, and October 2014, which followed Dr. Blake's May 12, 2014 opinion. (Tr. 25). As discussed above, the ALJ found Dr. Blake's opinion to be consistent with those records, and Jackson has not shown any error in that conclusion, which is supported by

substantial evidence.[7]  Accordingly, the manner in which the ALJ relied on Dr. Blake's opinion was not improper.

Jackson also argues that the "opinion of a non-examining physician is entitled to little weight if contrary to the opinion of a treating physician," and asserts that the ALJ improperly gave controlling weight to a non-examining psychiatrist [*i.e.*, Dr. Blake], contrary to case law and agency standards, and as such this matter must be remanded."  (Doc. #11 at 17-18).  But Jackson's argument lacks merit in multiple, fundamental respects.  First, Jackson fails to identify any treating physician opinion that the ALJ should have credited over Dr. Blake's opinion.  Second, Jackson's very premise about the relative weight an ALJ must give to treating and non-examining opinions is significantly flawed.

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").  Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  But "the Sixth Circuit

---

[7] In reaching this conclusion, the Court recognizes that the record reflects that Jackson has been exposed to trauma-inducing circumstances which have caused him to suffer certain impairments. However, the Court is limited in its review of the record through "Exhibit 4F" (*see supra* at note 3) and, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406.

has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski*, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016) ("The magistrate judge appropriately cited [*Dyer*, 568 F. App'x at 428], for the proposition that the opinions of consulting sources may be preferred over those of treating sources when the latter are not well supported by the record.  The magistrate judge's analysis is sound.").

In this case, as mentioned above, Jackson fails to argue, let alone show, that an opinion by Jackson's treating physician is consistent with the medical record and should therefore have been given controlling weight over Dr. Blake's opinion.  In fact, Jackson does not even identify a treating physician by name whose opinion Jackson believes should have been afforded greater weight over Dr. Blake's opinion.  Thus, this argument by Jackson fails.

> 2.    *The ALJ's Mental RFC is Supported by a Medical RFC Assessment, and the ALJ Properly Addressed Jackson's Work-Related Mental Functions*

Jackson argues that the ALJ formulated the RFC by impermissibly supplanting her own opinion for that of a medical professional.  According to Jackson, although the ALJ gave "great weight" to Dr. Blake's opinion, Dr. Blake "only indicates his opinion concerning [Jackson's] ability to maintain concentration, persistence or pace[;] interact and relate with others; and as to whether he has experienced extended[] episodes of decompensation."  (Doc. #11 at 19).  Jackson contends that "Dr. Blake does not address [Jackson's] work-related functions outlined in SSR 96-8p and SSR 85-15."  (*Id.*).  Specifically, Jackson claims that Dr. Blake "did not articulate an opinion concerning [Jackson's] ability to understand, carry out, and remember instructions; use judgement in making work-related decisions; respond appropriately to supervision, co-workers

and work situations; and deal with changes in a routine work setting." (*Id.* at 21). Jackson therefore argues that instead of relying on a medical RFC assessment that addresses Jackson's work-related functional limitations caused by his mental impairments, the ALJ created an RFC that "is merely conclusory and does not contain any rationale or reference to supporting evidence, as required by SSR 96-8p." (*Id.* at 19). In Jackson's view, this merits remand "pursuant to SSR 96-8p and SSR 83-10."[8] (*Id.*). The Court disagrees.

SSR 85-15, 1985 WL 56857, at *2 (1985), is inapplicable because it "does not apply to cases where both exertional and non-exertional impairments are alleged, and in this case [Jackson] has alleged that []he is disabled by both." *Johnson v. Comm'r of Soc. Sec.*, No. 14-cv-14713, 2015 WL 12670490, at *10 (E.D. Mich. Sept. 18, 2015) (internal citations omitted).[9]

SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996), provides that "[w]ork-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgement in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." Here, Dr. Blake did opine on the work-related functions laid out in SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996). Among other findings, Dr. Blake determined that Jackson's ability to understand, carry out, and remember very short and simple instructions was not significantly limited – whereas his ability to understand, carry out, and

---

[8] Jackson does not specify what parts of SSR 96-8p and SSR 83-10 provide grounds for remanding the case on this issue. Moreover, SSR 83-10, 1983 WL 31251 (1983) is called "Titles II and XVI:  Determining Capability to do Other Work – The Medical-Vocational Rules of Appendix 2" and applies to Step Five of the ALJ's sequential analysis. Thus, SSR 83-10 does not apply to Jackson's current argument, which centers around the RFC at Step Three.

[9] The Court notes that counsel for Jackson also represented the plaintiff in *Johnson v. Comm'r of Soc. Sec.*, No. 14-cv-14713, 2015 WL 12670490, at *10 (E.D. Mich. Sept. 18, 2015), where the court previously explained the inapplicability of SSR 85-15, 1985 WL 56857 (1985), to cases involving both exertional and non-exertional impairments.

remember detailed instructions was moderately limited. (Tr. 76). Dr. Blake concluded that Jackson's ability to make simple work-related decisions was not significantly limited. (*Id.*). Dr. Blake found that Jackson's ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and his ability to maintain socially-appropriate behavior and to adhere to basic standards of neatness or cleanliness were all moderately limited. (Tr. 77). Further, Dr. Blake opined that Jackson's ability to respond appropriately to changes in the work setting was not significantly limited. (*Id.*). Given that Dr. Blake did, in fact, address Jackson's work-related mental functions, the ALJ properly relied on Dr. Blake's opinion to establish the RFC, particularly because "State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). Thus, Jackson's argument regarding the ALJ's failure to rely on a medical RFC assessment for the mental component of the RFC has no merit and provides no grounds for remand.

Jackson also argues that the ALJ's RFC assessment "does not consider the impact of [Jackson's mental impairments] on [his] functional ability as required by SSR 96-8p." (Doc. #11 at 21). He contends that "nowhere in [the ALJ's] decision addresses [Jackson's] ability to understand, carry out and remember instructions; undergo and use judgment in making work-related decisions; and respond appropriately to work situations." (*Id.*). Again he asks that the case be remanded so that the ALJ may properly assess his RFC pursuant to SSR 96-8p and SSR 85-15.[10] (*Id.* at 22). The Court finds that remand on this issue is not appropriate.

The ALJ did explicitly consider Jackson's functional ability resulting from his mental limitations and included them in the RFC as follows: "[Jackson] is restricted to simple, routine

---

[10] For the reasons explained above, SSR 85-15, 1985 WL 56857 (1985), is inapplicable to the instant case. *See supra* at 20.

and repetitive tasks and simple work related decisions. [Jackson] can frequently respond appropriately to coworkers, supervisors and the public. [Jackson] can deal with only simple changes in the work setting." (Tr. 22). Even if the ALJ had not addressed each of these work-related functions, "an ALJ is not required to include in her RFC assessment any limitations which she does not find credible." *Johnson*, 2015 WL 12670490, at *10. Thus, contrary to Jackson's interpretation of the ALJ's decision, the ALJ did address the work-related mental functions listed in SSR 96-8p and did not err in this regard.

3.     *The ALJ Did Not Err in Failing to Provide a Function-by-Function Assessment of Jackson's Exertional Capacity*

Jackson argues that the ALJ did not comply with SSR 96-8p by not including in her decision a "function-by-function assessment" of Jackson's exertional capacity, which involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. (Doc. #11 at 22-23) (citing SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). Indeed, Jackson claims that "nowhere in the [ALJ's] decision does the ALJ go through a function-by-function assessment[,] including evaluating each strength demand separately in the decision and the medical [evidence] she relied upon in assessing [Jackson's] RFC." (*Id.* at 23). Moreover, Jackson acknowledges that the ALJ gave great weight to the opinion of Bina Shaw, M.D., but argues that "nowhere in Dr. Shaw's opinion does Dr. Shaw address [Jackson's] ability to carry, push, and pull as required by SSR 96-8p." (*Id.*).

The Sixth Circuit has expressly rejected this very argument:

> Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing . . . . [T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.

*Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-48 (6th Cir. 2002) (quoting *Bencivengo v.*

*Comm'r of Soc. Sec.*, 251 F.3d 153 (3d Cir. Dec. 19, 2000) (internal citations omitted)); *see also Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (holding that the ALJ met the requirements of SSR 96-8p where the medical evidence supported an assessment of medium work capacity).

Here, the ALJ provided a thorough discussion of the basis for her RFC assessment of Jackson, including the nature of Jackson's impairments and resulting functional limitations, and how she analyzed the evidence of record in making that assessment.  (Tr. 21-26).  The ALJ's RFC assessment clearly reflects consideration of Jackson's exertional capacity, as it restricts him to light work, which by definition "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

Furthermore, the ALJ pointed to medical evidence in the record that supports her RFC assessment.  The ALJ explained that she gave "great weight" to Dr. Shaw's determination that Jackson "could sit, stand and walk for eight hours a day with intermittent rest periods every four hours," "could bend up to 40 degrees and lift at least 20 pounds without difficulty," and "should avoid frequent kneeling, twisting, turning and crouching."  (Tr. 25) (citing Tr. 358).  The ALJ concluded, based on a review of the record, that "[t]here is no opinion in evidence from any medically acceptable source that the claimant has any greater sustained physical limitations in work related functioning."  (*Id.*).

Regardless, Jackson takes issue with the fact that "nowhere" did Dr. Shaw address his ability to carry, push, and pull.  (Doc. #11 at 23).  But Dr. Shaw did consider these three strength demands, and in a form that accompanied her report, she did not indicate that Jackson was

incapable of carrying, pushing, and pulling or that he had a notable limitation performing them.[11]

(Tr. 361).   Moreover, Jackson, who bears the burden of proving his RFC, does not allege a restriction with carrying, pushing, and pulling, and he does not point to evidence where restrictions greater than those determined by the ALJ were imposed.   Accordingly, the Court rejects this claim of error.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Jackson's Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.


Dated: November 1, 2017                              s/David R. Grand
Ann Arbor, Michigan                                  DAVID R. GRAND
                                                     United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.   *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

---

[11] The form asked Dr. Shaw to assess Jackson's "current abilities" based on her objective examination of him.   (Tr. 361).   Specifically, Dr. Shaw was asked if Jackson could perform a range of listed activities, which included carrying, pushing, and pulling – but also sitting, standing, bending, squatting, climbing stairs, buttoning clothes, tying shoes, dressing and undressing, dialing a telephone, and making a fist, among others.   (*Id.*).   In response, Dr. Shaw wrote a straight vertical line through the entire "Yes" column immediately to the right of the extensive list of activities.   (*Id.*).   Although there are some additional handwritten markings on the form, from what the Court can tell, these markings are not meant to negate Dr. Shaw's answer in the affirmative regarding Jackson's ability to carry, push, and pull.

72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any

further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431

F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will

be preserved for the Court's appellate review; raising some objections but not others will not

preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829

F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th

Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich.

LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with

a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the

objections.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on November 1, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
